**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISON**

| | |
|---|---|
| Carlyle Development, LLC,        ) | |
|        ) | |
|        Plaintiff,    ) | **Civil Action No.**   3:24-cv-05697-MGL |
|        ) | |
| v.        ) | |
|        ) | **COMPLAINT** |
| City of Camden, City of Camden Planning  ) | (JURY TRIAL DEMANDED) |
| Commission, Kershaw County, Jeffrey   ) | |
| Graham, Hamilton Boykin, Joanna Craig,  ) | |
| Stephen Smoak, Johnny Deal, Mark Mohr,  ) | |
| Charles Wood, Connie Rouse, Jay Hudson,  ) | |
| Travis Hall, Mark Chickering, Russell Brazell,  ) | |
| Danny Catoe, Jimmy Jones, Derek Shoemake,  ) | |
| and Brant Tomlinson, in their personal and  ) | |
| official capacities,   ) | |
|        ) | |
|        Defendants.  ) | |

Plaintiff Carlyle Development, LLC ("Carlyle") complaining of Defendants, hereby alleges as follows:

## **INTRODUCTION**

1.    This matter involves Carlyle's efforts and legal right to develop a residential subdivision on its property, and the Defendants' series of unconstitutional actions preventing that development. Carlyle prepared comprehensive development plans in reliance on and in conformity with the City of Camden and Kershaw County's building and zoning ordinances, and with directions and assurances from their staff. Nonetheless, Defendants improperly delayed decisions, arbitrarily changed rules, and abused governmental process to avoid approving the development plans. Despite being provided numerous, compliant residential development plans, and against the recommendations of their professional in-house staff, Defendants are attempting to force Carlyle to use the property as an equine training facility even though that is not a viable use of the property.

This is a taking of property without just compensation and a violation of Carlyle's rights to due process and equal protection guaranteed by the Constitution.

## PARTIES

2.      Plaintiff Carlyle is organized and exists under the laws of the State of Delaware.  It has owned the Property for almost twenty years.

3.      Defendant City of Camden (the "City" or "Camden") is a municipality in Kershaw County, South Carolina.

4.      Defendant Jeffrey Graham is a resident of Kershaw County and a member of the Camden City Council.

5.      Defendant Hamilton Boykin is a resident of Kershaw County and a member of the Camden City Council.

6.      Defendant Joanna Craig is a resident of Kershaw County and a member of the Camden City Council.

7.      Defendant Stephen Smoak is a resident of Kershaw County and a member of the Camden City Council.

8.      Defendant City of Camden Planning Commission ("City Planning Commission" or "Planning Commission") is an appointed local planning commission as defined in S.C. Code § 6-29-310, also known as the South Carolina Local Government Comprehensive Planning Enabling Act of 1994, and was created by this legislation.

9.      Defendant Johnny Deal is a resident of Kershaw County and Chair of the City Planning Commission.

10.     Defendant Mark Mohr is a resident of Kershaw County and a member of the City Planning Commission.

11.    Defendant Charles Wood is a resident of Kershaw County and a member of the City Planning Commission.

12.    Defendant Connie Rouse is a resident of Kershaw County and a member of the City Planning Commission.

13.    Defendant Jay Hudson is a resident of Kershaw County and a member of the City Planning Commission.

14.    Defendant Travis Hall is a resident of Kershaw County and a member of the City Planning Commission.

15.    Defendant Mark Chickering is a resident of Kershaw County and a member of the City Planning Commission.

16.    Defendant Kershaw County (the "County" or "Kershaw") is a government subdivision of the State of South Carolina.

17.    Defendant Russell Brazell is a resident of Kershaw County and a member of the Kershaw County Council.

18.    Defendant Danny Catoe is a resident of Kershaw County and a member of the Kershaw County Council.

19.    Defendant Jimmy Jones is a resident of Kershaw County and a member of the Kershaw County Council.

20.    Defendant Derek Shoemake is a resident of Kershaw County and a member of the Kershaw County Council.

21.    Defendant Brant Tomlinson is a resident of Kershaw County and a member of the Kershaw County Council.

**JURISDICTION AND VENUE**

22.     Jurisdiction is proper under 28 U.S.C. § 1131 as there are federal claims under 42 U.S.C.A. § 1983 and the Fifth and Fourteenth Amendments of the United States Constitution. The Columbia Division is proper as both the subject property and Defendants are in Kershaw County.

**GENERAL ALLEGATIONS**

23.     Carlyle owns real property that is comprised of six parcels and commonly identified with the address 1100 Chesnut Street, Camden, South Carolina, 29020 (the "Property"). The Property is further associated with the Tax Map Numbers C270-00-00-13, C270-00-00-014, C270-00-00-015, C270-15-00-003, 270-00-00-014, and 270-19-00-001.

24.     Carlyle has owned the Property for approximately twenty years.

25.     The bulk of the Property, approximately 250 acres, is located in Kershaw County. The remaining portion of the Property, approximately 93 acres, is located in the City of Camden. The part of the Property in the County is surrounded by City property. As the former City Manager put it, the Property is the "donut hole" of Camden.

26.     The Property was once operated as the Camden Training Center (the "Center"), which was a thoroughbred horse training facility. However, due to changes in the equine industry, the horse population decreased dramatically over the past twenty years, and there are no more horses left at the Center.

27.     The Center is now permanently closed.

28.     Carlyle proposed developing the now vacant land on the Property into residential housing. This option to develop the Property into residential housing was known to Carlyle at the time it decided to purchase the Property and was an integral part of that decision.

29.     From the time Carlyle purchased the Property, the Kershaw-portion was (and still is) zoned by the County as R-6, which meant that residential housing could be built with lot sizes

of at least 6,000 square feet—until the County changed its zoning rules in response to Carlyle's plans.

30.    From the time Carlyle purchased the Property, the Camden-portion was (and still is) zoned by the City as primarily R-15 with a small portion zoned R-10, which meant that residential housing could be built with lot sizes of at least 15,000 and 10,000 square feet, respectively—until the City changed its zoning rules in response to Carlyle's plans.

31.    Upon information and belief, the City and County changed their rules in order to force the Property to be used only as an equine facility, even though a privately-owned equine facility is no longer viable on the Property.

32.    Moreover, there is a 661-acre state-owned equine facility less than a quarter mile from the Property, the Springdale Racecourse, which hosts the Carolina Cup, that has significant vacancies and only maintains operations due to state subsidies. The Springdale facility could take on over 100 additional horses if such demand were ever to materialize.

**ALLEGATIONS AS TO CITY DEFENDANTS**
**(As to Defendants City of Camden, City of Camden Planning Commission, Jeffrey Graham, Hamilton Boykin, Joanna Craig, Stephen Smoak, Johnny Deal, Mark Mohr, Charles Wood, Connie Rouse, Jay Hudson, Travis Hall, and Mark Chickering, collectively, the "City Defendants")**

33.    Plaintiff realleges each and every allegation set forth above as if repeated verbatim herein.

34.    Carlyle worked with the City for over eighteen months in an effort to responsibly develop the Property. In May 2023, Carlyle, by and through its agents, approached the City regarding annexation of the Kershaw County portion of the Property in order to facilitate a cohesive development plan.

35.     Carlyle met with and received positive feedback from City staff and public officials. While the Property was already zoned for residential development, the City determined that a Master Planned District (MPD) was the best approach for this project. Carlyle discussed lot sizes, price points, and application procedures with City personnel, and then prepared preliminary site plans based on the City's input and suggestions.

36.     During the time Carlyle was working with the City on the annexation proposal, a picture of the preliminary site plan was leaked, misinformation on social media followed, and a Kershaw County Council Member commented negatively on the project to the media.

37.     In August 2023, in response to Carlyle's efforts to develop the Property, Kershaw County Council passed a zoning ordinance amendment increasing minimum lot size requirements for single-family residential developments zoned R-6 from 6,000 square feet to 15,000 square feet per lot. Upon information and belief, this amendment was substantially motivated by Carlyle's development plans. The amendment was rushed, passed without study, and blurred distinctions between zoning districts—effectively causing the size of the building lots to be the same regardless of whether the lots were zoned R-6, R-10, or R-15.

38.     During the fall of 2023, Carlyle and City personnel continued to meet and correspond about the project. Carlyle provided a Traffic Impact Study, an economic impact analysis, and other requested information, and revised plans in accordance with the directions and preferences of City personnel.

39.     On October 31, 2023, Carlyle formally submitted its annexation proposal to the City.

40.     On November 21, 2023, the City Planning Commission held a meeting and tabled the proposal until a formal development agreement was reached. That agreement would

memorialize terms such as development timing and phasing, the payment of certain development charges and fees, and other items.

41.    For the remainder of 2023 and into the first quarter of 2024, Carlyle and City personnel engaged in meetings and correspondence working on the development agreement and further revisions to the plan. At the City's request, Carlyle agreed to reduce the number of homes to be built and the acreage to be developed.

42.    On March 8, 2024, Carlyle submitted a revised annexation proposal to the City along with a final draft of the development agreement which had been agreed to by City staff, the mayor, and a majority of City Council.

43.    On March 19, 2024, the City Planning Commission voted to deny the revised MPD package even though City staff's formal recommendation was to annex the property, assign a zoning designation of Master Planned District, and approve the development agreement.

44.    On April 5, 2024, at the City's urging, Carlyle withdrew its annexation petition submittal to the City Council.

45.    During this time, the Kershaw County Council introduced and passed several zoning ordinance amendments involving lots size requirements that upon information and belief were designed to prevent Carlyle from developing the County-portion of the Property as presented in the annexation proposal.

46.    On April 19, 2024, Carlyle submitted a new plan to the City for residential development on only the City-portion of the property. This plan consisted of 193 patio homes intended as an active adult community with sizable open space areas. Traffic impacts would be minimal, the City tax base would increase, and needed housing market supply would be provided

through this plan. Importantly, these patio homes were permitted under then-existing City zoning code.

47.     On Tuesday, May 21, 2024, the City Planning Commission was scheduled to vote on the proposal. However, on Friday, May 17, 2024, at 4:00 P.M., City personnel informed Carlyle that their legal counsel decided that the Commission could not consider the plan due to a purported issue with a right-of-way abandonment for a street located at a small corner of the Property. Carlyle asked if a conditional approval could be issued or if there were other options to remain on the May Commission agenda. City personnel did not respond to that request, and did not allow consideration of the proposal at the May Commission meeting.

48.     Thereafter, Carlyle revised the plan to exclude the road abandonment (removing six planned homes adjacent to that street) and resubmitted it to the City on May 24, 2024, so that it could be considered at the Planning Commission meeting in June. This revised plan consisted of 187 patio homes on just under 60 acres with a twenty-foot buffer around the development and over twenty-three acres of open space. This plan was again compliant with City ordinances.

49.     Upon information and belief, after receiving this plan, City officials instructed City staff to prepare an amendment to the City zoning ordinance to block Carlyle's proposal.

50.     City staff then told Carlyle that its revised plan would not be considered at the June meeting because the City was amending the zoning ordinance to eliminate the patio home conditional use in R-15. However, the first reading of the new ordinance did not even take place until June 11, 2024, more than two weeks after Plaintiff had submitted a plan that conformed to the existing zoning code. This is not the proper use of the Pending Ordinance Doctrine as the City contended, but instead constitutes discriminatory zoning.

51.     On June 13, 2024, Plaintiff submitted a second plan for the Property with 153 homes reconfigured to comply with the City's new R-15 zoning restrictions. For the portion of the Property zoned R-15, the second plan converted the patio homes to single-family residences using the cluster development approach pursuant to Section 157.195 of the City's zoning ordinance. The cluster approach has general benefits such as protecting wetlands. For the remaining portion of the Property zoned R-10, the patio homes remained as they were still permissible under the new ordinance. This plan also added amenities such as a pool, pickleball courts, and a clubhouse.

52.     Based on direction from City personnel, Carlyle revised the second plan to address a technical zoning issue with one of the proposed lots. The second plan was then placed on the Planning Commission's June meeting agenda for consideration alongside, and as an alternative to, the original plan.  Carlyle was assured by one of the City Council Members that by making all of these concessions, Carlyle would receive favorable treatment.

53.     At the June 18, 2024 City Planning Commission meeting, Carlyle's request for approval of the first plan was denied, based on the fact that the City was in process of amending its zoning ordinance.

54.     Carlyle then immediately presented the second plan that complied with the amendment to City's zoning ordinance. City staff recommended the alternate plan for approval as it clearly conformed to even the City's new zoning standards. The Commission, however, tabled the vote to further delay Plaintiff's development. No reason was given for tabling the proposal, and no efforts were made by the Planning Commission or City staff to obtain additional information about the plans or the Property prior to making this decision.

55.     On July 16, 2024, the Planning Commission again considered Carlyle's second plan. Again, City staff recommended that the plan be approved. Nonetheless, without any

justification or proper explanation, the Commission unanimously voted to deny approval of the plan. After the meeting, the Planning Commission Chairman, Johnny Deal, admitted to a news outlet that the proposal met the City's Comprehensive Plan and mustered a vague reference to Camden being "horse country" to explain the Commission's decision.

56.     Two other Planning Commission members also acknowledged, prior to the vote, that Carlyle's alternate plan complied with applicable ordinances and would be an economic benefit to the City. However, none of the Commission members, in voting to deny the proposals, considered Carlyle's property rights to develop its land in compliance with the City's existing zoning ordinances, nor did they consider that there are no horses left on the Property.

57.     Within thirty days of the Planning Commission's decision, Carlyle filed an appeal. After that appeal was filed, lawyers for the City prepared an order in an attempt to retrospectively justify the decision (the "Order"). The Commission then approved the Order on August 20, 2024.

58.     The Order, however, does not accurately reflect the Planning Commission's public deliberations, misstates facts, and fails to establish a valid legal basis for the denial of Carlyle's development plans.

59.     In its "Basis for Determination," for example, the Order references the Camden Training Center as a facility that has been "used to train thoroughbred horses" and includes "a one-mile dirt track, a 7/8 mile turf course, a 5/8 mile secondary track, a polo field, trail access to the Springdale Race Course, ten barns, and paddocks." However, only the 5/8 mile secondary track is within the Property located in the City. There are no barns, paddocks, or any buildings or structures in the City-portion of the Property as the facility is almost entirely located in the County, outside of the City's jurisdiction.

60.     The Planning Commission did not inquire as to what equine facilities were actually within the City-property, and the Commission did not inquire as to whether there were any horses left on the Property. In fact, there were and are none. Approving either development proposal would not have decreased the amount of stalls available, the amount of horses that could be trained, or races that could be run, or had any other effect on the equine industry in Camden or Kershaw County.

61.     While the Order references the City's desire to have privately-owned equine-focused facilities, the equine industry has changed, and the Property cannot sustain a private training facility. The Planning Commission did not conduct any fact finding into whether such use of the Property was still viable.

62.     The City Defendants apparently want to force Carlyle to operate at a loss citing a vague and unsupported plan to encourage equestrian attractions and tourism in Camden. But again, there are no horses left on the Property and there are no public rights to enter or use the Property.

63.     The Order also cites the importance of trail access to the Springdale facility, the adjacent state-owned equine facility, and the goal of expanding public access to trails and recreation. The Planning Commission, however, did not consider the fact that the Springdale facility has over 100 available stalls for horses and vacancy rates of over 60% in-season and over 80% out-of-season. It further ignored the fact that approving either of Carlyle's proposals would have actually created public trails and recreational opportunities on the Property as such features were included in the development plans. Currently, there are no such trails, the Property cannot be used by the public, and the Commission's decision runs counter to its stated goal of "expand[ing] public access to parks, trails, and greenways."

64.     In addition, the Order wrongly identifies the City's Comprehensive Plan goals as being inconsistent with Carlyle's proposed development. For example, the Order cites Comprehensive Plan Goal 4.1 to "[i]ncrease the City's tax base through a thriving and diversified economy." Approving any of Carlyle's development plans would have substantially increased the City's tax base through an increase in property taxes, utility fees, and other tax gains for the City. For example, the City would provide electric, water, and sewer utilities to the developed property. At the time of the vote at least one Commission member acknowledged that the development would be good for the City's tax base, yet the Order wrongly indicates it would not.

65.     The Planning Commission did not conduct any fact finding with respect to the City's Comprehensive Plan, nor did it have any substantive discussions about the Comprehensive Plan either with Carlyle or during its public hearings. Contrary to the Order's assertion, the Commission did not discuss any "discrepancies" between Carlyle's plans and the Comprehensive Plan prior to its vote.

66.     In fact, Carlyle's plans and the City's Comprehensive Plan are consistent, which is why the City's planning staff recommended approval of Carlyle's development plan. For example, among other benefits, the development plans "encourage a broad range of housing opportunities and a balance of housing types" and "promote the development of a diverse housing stock" (Goal 3.1); establish and expand open spaces for the public (Goal 5.2); and provide much needed housing options for the current and future needs of a growing community (Goal 10.2).

67.     For further example, City staff recommended approval of the development plan because of how well it preserved open space. (Goal 5.3). The development plan includes approximately 22.3 acres of open space. This is approximately 37% of the total area of the site.

City Code Section 157.140(A)(1) requires developments with more than twenty single-family dwellings to have a minimum of 10% of the total area as open space.

68.    In addition, the Camden City Council has now passed a moratorium on residential subdivisions that is effective until March 31, 2025.  This moratorium was passed on August 27, 2024, a little over a month after Carlyle served Document Preservation Letters on both the City and the County, informing them that Carlyle intended to commence a legal action regarding their efforts to rezone and restrict development of the Property. In other words, the moratorium was not passed in the normal course of business but as a direct response to prevent Carlyle from developing the Property and as a reaction to impending litigation.

69.    In summary, under the City of Camden's Zoning and Land Development Ordinance, Carlyle's plan submitted in April of 2024 conformed to the City's zoning standards and should have been approved. However, in response to Carlyle's submission, the City drafted an ordinance amendment that would prohibit Carlyle's plan, and then used that as an excuse to deny Carlyle's proposal. After Carlyle submitted its second plan, which conformed to the new ordinance, the Planning Commission tabled the vote and later unanimously denied it for no reason other than a vague reference to Camden being "horse country."  Finally, the City has improperly imposed a moratorium until 2025 to further prevent Carlyle from exercising its property rights.

70.    Not only have the City Defendants coordinated to take away Carlyle's property rights, but upon information and belief some or all of the City Defendants have further colluded with Kershaw County personnel and others to improperly restrict development of the Property.

**GENERAL ALLEGATIONS AS TO KERSHAW DEFENDANTS**
**(as to Defendants Kershaw County, Russell Brazell, Danny Catoe, Jimmy Jones, Derek Shoemake, and Brant Tomlinson, collectively, the Kershaw Defendants)**

71.     Plaintiff realleges each and every allegation set forth above as if repeated verbatim herein.

72.     As alleged hereinabove, some or all of the Kershaw Defendants received information about the annexation and development proposal Carlyle provided to the City before that proposal was made public, and a Kershaw County Council Member commented negatively on the project to the media before any development plans were submitted.

73.     In August 2023, while Carlyle was working on its annexation plan with the City, Kershaw County Council passed a zoning ordinance amendment that increased minimum residential lot size requirements for property zoned R-6 from 6,000 square feet per lot to 15,000 square feet per lot. Upon information and belief, this amendment was substantially motivated by Carlyle's development plans. However, the amendment did not include any specifications for or changes to the County's conditionally permitted uses, which allow for smaller patio homes and townhouses on properties like the R-6 zoned County-portion of the Property.

74.     A week after the City Planning Commission voted to deny Carlyle's annexation proposal, on March 27, 2024, Carlyle submitted a Major Subdivision Sketch Plan to the County for the County-portion of the Property with patio homes and townhomes as permitted under R-6 zoning in the County.

75.     The County's Planning and Zoning Director, Joey Adams-Raczowski, rejected that submittal asserting that the day before, on March 26, 2024, the County amended its August 2023 amendment so that amendment would now apply to all residential uses and supersede any conflicting language elsewhere in the County's code. In other words, the 15,000 square foot lot size requirement would now apply to patio homes and town homes, and Carlyle's development

14

plan—which was based on and compliant with the August 2023 amendment—would be rejected accordingly.

76.    The County had not posted this amendment to its website prior to Carlyle's submittal, and Carlyle submission was in compliance with the published code.

77.    Upon information and belief, the County amended its code to prevent Carlyle from developing patio homes and townhomes as allowed by the prior zoning ordinance.

78.    On April 15, 2024, Carlyle contacted the County for clarification on the status of R-6 zoning and multi-family development, which would be permissible under the new zoning rules. County personnel replied by stating they would not accept any such submissions as the County was instituting yet another amendment to the ordinance—this time increasing the minimum lot size for R-6 zoned property from 15,000 square feet to 21,780 square feet (1/2 an acre) and decreasing the maximum density for both single family and multi-family development. The County further improperly refused to allow Carlyle to amend its prior submission.

79.    On April 16, 2024, the Kershaw County Planning Commission held a specially called meeting to consider this latest ordinance amendment. This hearing was scheduled at the request of County Council to expedite the required procedures for amending ordinances. The hearing made abundantly clear that the proposed amendment was intended to stop Carlyle from developing the Property. Because of the impact on Carlyle's property rights, and due to the irregular, rushed, and overreaching nature of the amendment, the County Planning Commission voted against the amendment.

80.    Nonetheless, the Kershaw County Council disregarded the County Planning Commission's unfavorable recommendation and proceeded with a first reading of the new

amendment on April 23, 2024, and then passed the ordinance, thereby requiring a half-acre lot for all residential building in Kershaw County.

81.     The effect of the County's actions was to increase the required size of lots to be developed on the Property from 6,000 square feet per lot to 21,780 square feet per lot. Such a dramatic cut makes development of the Property impossible and deprives the Property of any value.

82.     In summary, the County passed three different zoning ordinance amendments aimed at preventing Carlyle from developing the Property, and improperly refused to allow Carlyle to amend its submission to comport with the changing ordinances.  The County Defendants have also improperly coordinated with the City Defendants to delay votes and decisions to provide time to change their code and enforce new development restrictions on the Property.

83.     All the Defendants herein have repeatedly changed the zoning standards for the Property to make Carlyle's development impossible. Further, the Defendants have made clear that they will never allow a viable residential development on the Property; that instead, it will remain an equine facility at Carlyle's expense with or without horses being present.

84.     Several of the Defendants, and those purporting to act on their behalf, have made clear they intend to prevent Carlyle from developing the Property and to devalue the Property so that they, their friends, and/or an organization can buy the Property at a substantially reduced price to keep the Property as an equine facility. Such threats and low-ball offers have been made throughout the last eighteen months by unnamed co-conspirators.

85.     Defendants' actions have resulted in economic damages to Carlyle in excess of Twenty-Five Million Dollars ($25,000,000).

## FOR A FIRST CAUSE OF ACTION
### (Due Process Violations as to Defendants City of Camden, City of Camden Planning Commission, and Kershaw County)

86.    Plaintiff realleges each and every allegation set forth above as if repeated verbatim herein.

87.    Carlyle has a valid property interest in the above-described real property.

88.    Defendants have taken actions that violate Carlyle's rights under the Fifth and Fourteenth Amendments of the United States Constitution, including both procedural and substantive due process violations, to wit:

    a.    Voting to amend zoning ordinances as a direct response to Carlyle's proposals and, in effect, engaging in improper "spot zoning;"

    b.    Refusing to approve Carlyle's plans and applications for subdivision that conformed to the zoning ordinances of both the City and County when submitted;

    c.    Passing a moratorium on major residential subdivisions until March 31, 2025;

    d.    Failing to provide Carlyle adequate notice and an opportunity to be heard prior to its various rule changes and rejections of Carlyle's proposals;

    e.    Taking actions with procedural irregularities; and

    f.    Taking actions that go beyond the limits of legitimate governmental action.

89.    Defendants' actions have been unreasonable, arbitrary, and capricious, and lack a legitimate, rational basis.

90.    Defendants' actions have deprived Carlyle of its constitutional rights.

91.     As a direct and proximate result of Defendants' actions, Carlyle has been damaged in an amount to be more specifically proven at trial.

### FOR A SECOND CAUSE OF ACTION
**(Equal Protection Violation as to Defendants City of Camden, City of Camden Planning Commission, and Kershaw County)**

92.     Plaintiff realleges each and every allegation set forth above as if repeated verbatim herein.

93.     Carlyle has a valid property interest in the above-described real property.

94.     Defendants have taken actions that violate Carlyle's rights under the Fourteenth Amendment of the United States Constitution, to wit:

      a.     Unreasonably, arbitrarily, and capriciously amending zoning ordinances in direct response to Carlyle's proposals, and, in effect, engaging in improper "spot zoning";

      b.     Unreasonably, arbitrarily, and capriciously refusing to approve Carlyle's plans and applications for subdivision that conformed to the zoning ordinances of both the City and County when submitted;

      c.     Passing a moratorium on major residential subdivisions until March 31, 2005;

      d.     Unreasonably and improperly treating Carlyle's development plans and requests differently than other applicant's development requests; and

      e.     Taking other actions in direct response to Carlyle's plans and requests without a legitimate basis for doing so.

95.     Defendants' actions have been unreasonable, inconsistent, and lack a legitimate, rational basis.

96.     Defendants' actions have deprived Carlyle of its constitutional rights.

97.     As a direct and proximate result of Defendants' actions, Carlyle has been damaged in an amount to be more specifically proven at trial.

**FOR A THIRD CAUSE OF ACTION**
**(Inverse Condemnation as to Defendants City of Camden and Kershaw County)**

98.     Plaintiff realleges each and every allegation set forth above as if repeated verbatim herein.

99.     Defendants have engaged in affirmative, positive, and aggressive acts towards Carlyle. For example, changing zoning rules after Carlyle submitted compliant development plans and/or applications and then denying said plans and applications.

100.    As a direct and proximate result of Defendants' affirmative, positive, and aggressive conduct, Carlyle has been deprived of the use and enjoyment of the Property and the market value of the property has significantly diminished.

101.    Defendants' actions have been for a purportedly public use. For example, Defendants are attempting to force the Property to be used as a privately-owned equine-oriented facility to boost tourism and for local image and branding purposes. Defendants have taken these actions in spite of the fact that the equine industry has changed and operating a private training facility on the Property is not financially viable.

102.    The above-described conduct amounts to a government appropriation and taking of property. Among other impacts, in effect, Carlyle has been deprived of all the economic use of its property, which is a taking *per se*.

103.    Consequently, Defendants are liable to Carlyle for the uncompensated taking of its property and, pursuant to the Fifth Amendment of the United States Constitution and the

Constitution of the State of South Carolina, Art. I §13, Carlyle is entitled to an award of just compensation in an amount to be determined by a jury.

## FOR A FOURTH CAUSE OF ACTION
**(42 U.S.C.A. § 1983 Due Process Violations as to Defendants Jeffrey Graham, Hamilton Boykin, Joanna Craig, Stephen Smoak, Johnny Deal, Mark Mohr, Charles Wood, Connie Rouse, Jay Hudson, Travis Hall, Mark Chickering, Russell Brazell, Danny Catoe, Jimmy Jones, Derek Shoemake, and Brant Tomlinson, in their official and individual capacities)**

104.     Plaintiff realleges each and every allegation set forth above as if repeated verbatim herein.

105.     Carlyle has a valid property interest in the above-described real property.

106.     Defendants have taken actions that violate Carlyle's rights under the Fifth and Fourteenth Amendments of the United States Constitution, including both procedural and substantive due process violations, to wit:

a.     Voting to amend zoning ordinances as a direct response to Carlyle's proposals and, in effect, engaging in improper "spot zoning;"

b.     Refusing to approve Carlyle's plans and applications for subdivision that conformed to the zoning ordinances of both the City and County when submitted;

c.     Passing a moratorium on major residential subdivisions until March 31, 2025;

d.      Failing to provide Carlyle adequate notice and an opportunity to be heard prior to its various rule changes and rejections of Carlyle's proposals;

e.     Taking actions with procedural irregularities; and

f.     Taking actions that go beyond the limits of legitimate governmental action.

107.     Defendants' actions have been unreasonable, arbitrary, and capricious.

108.    Defendants' actions were taken under the color of law and deprived Carlyle of its constitutional rights.

109.    As a direct and proximate result of Defendants' actions, Carlyle has been damaged in an amount to be more specifically proven at trial.

## FOR A FIFTH CAUSE OF ACTION
**(42 U.S.C.A. § 1983 Equal Protection Violation as to Defendants Jeffrey Graham, Hamilton Boykin, Joanna Craig, Stephen Smoak, Johnny Deal, Mark Mohr, Charles Wood, Connie Rouse, Jay Hudson, Travis Hall, Mark Chickering, Russell Brazell, Danny Catoe, Jimmy Jones, Derek Shoemake, and Brant Tomlinson, in their official and individual capacities)**

110.    Plaintiff realleges each and every allegation set forth above as if repeated verbatim herein.

111.    Carlyle has a valid property interest in the above-described real property.

112.    Defendants have taken actions that violate Carlyle's rights under the Fifth and Fourteenth Amendments of the United States Constitution, to wit:

    a.    Unreasonably, arbitrarily, and capriciously amending zoning ordinances in direct response to Carlyle's proposals, and, in effect, improperly engaging in "spot zoning";

    b.    Unreasonably, arbitrarily, and capriciously refusing to approve Carlyle's plans and applications for subdivision that conformed to the zoning ordinances of both the City and County when submitted;

    c.    Passing a moratorium on major residential subdivisions until March 31, 2005;

    d.    Unreasonably and improperly treating Carlyle's development plans and requests differently than other applicant's development requests; and

21

e.     Taking other actions in direct response to Carlyle's plans and requests without a legitimate basis for doing so.

113.    Defendants' actions have been unreasonable, inconsistent, and lack a legitimate, rational basis.

114.    Defendants' actions were taken under the color of law and deprived Carlyle of its constitutional rights.

115.    As a direct and proximate result of Defendants' actions, Carlyle has been damaged in an amount to be more specifically proven at trial.

**FOR A SIXTH CAUSE OF ACTION**
**(Civil Conspiracy as to all Defendants)**

116.    Plaintiff realleges each and every allegation set forth above as if repeated verbatim herein.

117.    Carlyle began discussions with the City and its representatives in 2023 regarding a Major Subdivision Plan that involved real property partly located in the County. As detailed hereinabove, the County then instituted a series of zoning ordinance changes directed at Carlyle while Carlyle was attempting to work with the City.

118.    During this time, the City also made several zoning changes and took further actions to prevent Carlyle from developing the Property.

119.    Upon information and belief, City and County officials communicated either directly or indirectly (through presently unnamed co-conspirators) and otherwise coordinated for the improper purpose of effectively rezoning Carlyle's Property so that it will only remain usable as an equine facility and/or open space. The City has since made clear it wants the County-portion of the property to be used only for equine purposes.

120.    In addition, Carlyle is informed and believes that certain Defendants have had a personal stake and an ulterior motive to prevent Carlyle from developing the Property as they wished to purchase, have friends purchase, or have an organization dedicated to keeping the Property as an equine facility purchase the Property at substantially below fair market value.

121.    Upon information and belief, the Defendants have acted in combination and with other unnamed parties to deprive Carlyle of its property rights and ensure that the property remains usable only as an equine facility and/or open space.

122.    Upon information and belief, Defendants have committed overt acts in furtherance of this conspiracy, including, for example, tabling or postponing consideration of Carlyle's proposals to amend zoning ordinances and rushing amendments to zoning ordinances outside of the ordinary course of business to prevent Carlyle's development.

123.    As a direct and proximate result of Defendants' actions, Carlyle has been damaged in an amount to be more specifically proven at trial.

**WHEREFORE**, Plaintiff prays for judgment against Defendants for:

A.    Actual, special, consequential, and punitive damages in an amount to be more specifically proven at trial;

B.    Prejudgment interest;

C.    Costs associated with bringing of this action, including any attorneys' fees and other expenses as permitted by S.C. Code Section 28-11-30(3); and

D.    For such other and further relief as the Court may deem just and proper.

[SIGNATURE PAGE FOLLOWS]

Respectfully submitted,

LEWIS BABCOCK L.L.P.

*s/ Joseph B. Berry*
Joseph B. Berry (D.S.C. Bar No. 12883)
1513 Hampton Street (29201)
Post Office Box 11208
Columbia, South Carolina 29211
(803) 771-8000
jbb@lewisbabcock.com

ATTORNEYS FOR PLAINTIFF

Columbia, South Carolina
October 9, 2024